**IT IS ORDERED as set forth below:**

**Date: November 19, 2018**

_____
**Paul Baisier
U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| In re: | | CASE NUMBER |
|---|---|---|
| **PATRICIA RENEE BEST,** | | **18-58958-PMB** |
| Debtors. | | CHAPTER 13 |
| **PATRICIA RENEE BEST,** | | |
| Movant, | | |
| v. | | CONTESTED MATTER |
| **ALLY FINANCIAL, INC.,** | | |
| Respondent. | | |

### ORDER (I) DENYING DEBTOR'S MOTION FOR SANCTIONS, AND
### (II) DENYING CONFIRMATION OF DEBTOR'S PLAN WITH LEAVE TO AMEND

On November 13, 2018, the captioned Chapter 13 case came on for a specially set hearing (the "Hearing") on (i) confirmation of the *Chapter 13 Plan* (Docket No. 6)(the "Plan") filed by the Debtor named above (the "Debtor") on May 31, 2018, (ii) the *Motion to Have Court Decide if*

*Debtor May be Awarded Financial and Pugnitive (sic) Damages for Possible, Repeated Stay Violations by Ally Financial Inc., Reported in Prior Chapter 13 Case Number 18-50809* (Docket No. 19)(as subsequently amended,[1] the "<u>Sanctions Motion</u>"), and (iii) pleadings filed with regard to those two matters.[2]

Present at the Hearing were the Debtor, appearing *pro se*, Ally Financial Inc. ("<u>Ally</u>"), counsel for Ally, and counsel for Melissa Davey, the duly appointed Chapter 13 trustee in this case (the "<u>Trustee</u>"). Ally is a creditor of the Debtor, and holds an automobile loan on which the Debtor is obligated (the "<u>Loan</u>"). The Loan balance as of May 31, 2018 (the "<u>Filing Date</u>"),

---

[1] The Debtor filed a subsequent pleading on October 26, 2018 (Docket No. 30), entitled *Motion for Sanctions: Another Possible Stay Violation Committed by Ally Financial Inc. ("Ally") on September 7, 2018. As A Result, Debtor Now Seeks Punitive, Emotional Distress and Financial Loss Damages*, which amends her original pleading. Further, at the Hearing, the Debtor orally amended her pleadings to request relief related to a call made by Ally to her brother on October 5, 2018.

[2] Other pleadings filed by the parties with regard to these two matters prior to the Hearing include: *Chapter 13 Trustee's Objection to Confirmation & Motion to Dismiss Case Pursuant to 11 U.S.C. Section 109(g)(1)* (Docket No. 16) filed by the Trustee on July 24, 2018; *Objection to Confirmation* (Docket No. 17) filed by Ally on July 30, 2018; *Response to Objections* (Docket No. 18) filed by the Debtor on August 22, 2018; *Response to Chapter 13 Trustee's Objection to Confirmation & Motion to Dismiss Case Pursuant to 11 U.S.C. Section 109(g)(1)* (Docket No. 20) filed by the Debtor on August 22, 2018; *Ally Financial Inc.'s Motion to Dismiss and Citation to Authority* (Docket No. 26) filed by Ally on October 1, 2018; *Response to Ally Financial Inc.'s Motion to Dismiss and Citation to Authority* (Docket No. 29) filed by the Debtor on October 26, 2018; *Response to Vanessa Leo's "Stipulation of Facts" Request Sent Via Email on November 1, 2018 at 2:54PM* (Docket No. 31) filed by the Debtor on November 2, 2018; *Statement of "Claim" Amount: Amendment to "Sanctions Motions" for Both Cases, No. 18-50809 and Case No. 18-58958* (Docket No. 32) filed by the Debtor on November 2, 2018; *Motion to Dismiss Ally Financial Inc.'s "Appraisal of Movant's Vehicle – 2013 Jeep Wrangler Unlimited Automobile, VIN: 1C4HJWDG2DL590569" on the Grounds of Inaccurate Vehicle Data, Omitted Vehicle History, "Diminished Value" Not Mentioned in Report nor Included in Market Value of Vehicle, Aftermarket Parts Purchased by Debtor Used to Inflate Market Value of Vehicle and Failure to Specify Which Aftermarket Part (sic) Were Purchased by Debtor* (Docket No. 33) filed by the Debtor on November 2, 2018; *Response in Opposition to Debtor's Second Motion for Sanctions and Financial, Punitive and Emotional Distress Damages* (Docket No. 38) filed by Ally on November 12, 2018; and *Response to Ally Financial Inc.'s "Opposition to Debtor's Second Motion for Sanctions and Financial, Punitive and Emotional Distress Damages"* (Docket No. 39) filed by the Debtor on November 13, 2018.

Post-Hearing pleadings regarding the two matters were also filed, including: *Statement of "Claim" Amount: Second Amendment to "Sanctions Motions" for Both Cases, No. 18-50809 and Case No. 18-58958-LRC* (Docket No. 40) filed by the Debtor on November 14, 2018; *Statement of "Claim" Amount: Second Amendment to "Sanctions Motions" for Both Cases, No. 18-50809 and Case No. 18-58958-LRC Amendment* (Docket No. 41) filed by the Debtor on November 14, 2018; and *Amendment: "Motion for Sanctions: for More Possible Automatic Stay Violations Committed by Ally Financial Inc. ("Ally") on September 7, 2018 and October 5, 2018. Debtor Now Seeks Punitive, Emotional Distress and Financial Loss Damages* (Docket No. 44) filed by the Debtor on November 15, 2018.

the filing date of this case, was in excess of $36,000.00. The Loan is secured by a 2013 Jeep Wrangler Sport (the "Car"). In the Plan, the Debtor proposes pursuant to 11 U.S.C. § 1325(a)(5)(B) to "cram down" Ally's secured claim to the value of the Car, which the Debtor asserts in the Plan is $22,375.00, to pay interest on that secured claim at five percent (5%) per annum, and to pay that claim (plus interest) after confirmation at $520.00 per month.

At the Hearing, counsel for the Trustee informed the Court (i) that the Debtor is current on the $560.00 monthly payments required under the Plan, (ii) that, based on the terms of the Plan and the filed claims in the case, the Debtor would have to make payments under the Plan for approximately fifty-nine (59) months to satisfy her payment obligations under the Plan as currently constructed, (iii) that all of the Trustee's other objections to the Plan have been resolved, and (iv) the Trustee would recommend confirmation of the Plan in its current form. Neither the Debtor or Ally objected to the Court's consideration of this information. Other than the provision of this information and certain other logistical information, counsel for the Trustee did not actively participate in the Hearing.

The Court heard evidence at the Hearing from the Debtor and from Ally regarding both the Sanctions Motion and confirmation of the Plan. The findings of fact and conclusions of law set forth below are based upon the evidence and argument at the Hearing, the arguments contained in the pleadings referenced herein, the docket in this case, and the docket in the Debtor's prior Chapter 13 case, Case No. 18-50809 (the "Prior Case").

**I.    Sanctions**

In the Sanctions Motion, the Debtor asserts that Ally violated the automatic stay by placing numerous telephone calls to the Debtor and to her brother.[3]  Two of those calls, both to the Debtor's brother, occurred during this case – one on September 7, 2018, the other on October 5, 2018.  The other four (4) calls did not occur during this Chapter 13 case, but occurred instead during the Prior Case.

In response to the Sanctions Motion, Ally asserted that any claims regarding the four (4) calls in the Prior Case were barred by res judicata or collateral estoppel because the Debtor had filed a motion for sanctions in the Prior Case, which was disposed of via an order (the "Prior Case Order") dismissing it for want of prosecution by the Debtor (*see* Prior Case, Docket Nos. 24, 29 and 32).  As the Court noted on the record at the Hearing, although the Prior Case Order does not say whether the dismissal of the sanctions motion in that case was with or without prejudice, under both Federal Rule of Civil Procedure 41(b)[4] (incorporated herein by Federal Rule of Bankruptcy Procedure 7041) and BLR 7041-1,[5] such a dismissal is an adjudication on the merits unless the

---

[3] No evidence was presented at the Hearing that Ally engaged in any collection activity on any of the calls, other than to seek contact information for the Debtor.  Specifically, as to the calls made to the Debtor in the Prior Case, they were all messages left for her.  She only returned one of the calls and said that she provided them no information and terminated the call once she realized the call was from Ally.  As to the September 7 call to the Debtor's brother, the caller sought only contact information for a "Patricia Best" and left his contact information with the Debtor's brother after the Debtor's brother promised to pass along that contact information.  As to the October 5 call, Ally's internal call notes (the only evidence of the content of that call) indicate that the Debtor's brother gave Ally the Debtor's contact information and asked not to be contacted further.

[4] Federal Rule of Civil Procedure 41(b) provides "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits." Fed.R.Civ.P. 41(b).

[5] BLR 7041-1(b) provides "[i]n accordance with the provisions of Rule 41(b) of the Federal Rules of Civil Procedure, a dismissal for want of prosecution operates as an adjudication upon the merits of the action unless the Bankruptcy Court specifies otherwise in its order of dismissal."  BLR 7041-1(b).

order expressly says otherwise (which the Prior Case Order does not). The Debtor having not presented any evidence that would justify setting aside the Prior Case Order under Federal Rule of Civil Procedure 60[6] (incorporated herein by Federal Rule of Bankruptcy Procedure 9024), any claims related to the four (4) calls made during the Prior Case are barred by res judicata and collateral estoppel.

As to the two (2) calls made to the Debtor's brother during this case, Ally's assertion was that they were a "mistake" and a "harmless error" because Ally did not mean to be calling the Debtor's brother about the Debtor, but instead were calling him about another "Patricia Best." Ally claimed that the name and phone number for the Debtor's brother were provided to them when they "skip traced" another Ally client named Patricia Best who lives in South Carolina (and who is not a debtor in bankruptcy) through Lexis-Nexis.

A. **Willful Violation of the Automatic Stay**

Section 362(a) operates a stay against, *inter alia*, "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(6). As one of the most fundament protections offered by the Bankruptcy Code to debtors, the automatic stay of Section 362(a) "afford[s] the debtor a breathing spell by stopping all collection efforts." *In re Harchar*, 393 B.R. 160, 167 (Bankr. N.D. Ohio 2008). Consequently, 11 U.S.C. § 362(k) provides for the imposition of sanctions where a party willfully

---

[6] Federal Rule of Civil Procedure 60(b) provides "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Fed.R.Civ.P. 60(b).

violates the stay of Section 362(a), and provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

In the Eleventh Circuit, a "willful violation" of the automatic stay occurs when the creditor "(1) knew the automatic stay was invoked and (2) intended the actions which violated the stay." *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1555 (11th Cir. 1996). The Debtor has to prove a willful stay violation by a preponderance of the evidence. *Spinner v. Cash In A Hurry, LLC* (*In re Spinner*), 398 B.R. 84, 94–95 (Bankr. N.D. Ga. 2008). However, the Debtor need only prove that the creditor knew of the stay and intended the action, not that the creditor intended that the action would violate the stay. *Jove*, 92 F.3d at 1555 (citing *Price v. United States*, 42 F.3d 1068, 1071 (7th Cir. 1994)); *Citizens Bank v. Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994), rev'd on other grounds, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Johnston Envtl. Corp. v. Knight* (*In re Goodman*), 991 F.2d 613, 620 (9th Cir. 1993); *Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292–93 (4th Cir. 1986); *In re Beckett*, 455 B.R. 9, 14 (Bankr. D. Mass 2011)(citing *In re Rosa*, 313 B.R. 1, 7 (Bankr. D. Mass. 2004)). As explained by the court in *In re Roche*:

> [P]roof of the defendant's intent to violate the stay is not required, only the defendant's intent to act must be shown. This intent to act can be shown where the defendant, after notice, fails to affirmatively halt actions that will violate the stay. A willful violation of the automatic stay may be found if the creditor knew of the automatic stay and its actions were intentional.

*In re Roche*, 361 B.R. 615, 622-23 (Bankr. N.D. Ga. 2005) (internal citations omitted).

Once the debtor proves those elements, the burden shifts to the creditor to prove its action, or inaction, did not violate the stay. *Jove*, 92 F.3d at 1556 (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)); *Emmert v. Taggart* (*In re Taggart*), 548 B.R.

6

275, 286 (9th Cir. B.A.P. 2016); *Gordon v. Hill* (*In re Wilson*), 454 B.R. 546, 551 (Bankr. N.D. Ga. 2011). Moreover, the creditor bears the burden, upon notice of the filing of the case, to undertake measures to ensure that the stay is not violated. *Roche*, 361 B.R. at 623.

Here, Ally does not dispute that it received notice of the instant case. Consequently, Ally was aware that the Debtor was protected by the automatic stay of Section 362(a) when it made the September 7 and October 5 calls. Thus, the first prong of 11 U.S.C. § 362(k) is met. Regarding the first call on September 7, Ally asserts that such call was a mistake and was placed unintentionally to the Debtor's brother due an error in its third-party skip tracing program. No contrary evidence was provided or elicited from Ally's witness. Nevertheless, even if this justification is satisfactory, Ally has failed to show why it should be excused from liability for the October 5 call.

Immediately after the first call on September 7, the Debtor called Ally, told Ally that they had called her brother, reminded them that she was in bankruptcy, and told them not to call him again. Instead, she informed them that they needed to contact her directly, but only through their attorney. The Ally employee with whom the Debtor spoke (Mr. Sneed), who was the same person who had called the Debtor's brother on September 7, must have known that he had called the brother regarding another account (because there were no notes in the Debtor's account about any such call on September 7). Despite that, Mr. Sneed apparently did nothing to assure that no further calls were made to the brother regarding the other "Patricia Best" account. He apparently made no effort to do that himself, nor did he report the problem to his superiors. The Ally witness at the Hearing indicated that she could have put a note in the correct file if she had been presented with the facts known to Mr. Sneed.

7

Notwithstanding all of the events of September 7, Ally again called the Debtor's brother on October 5. Hence, it appears that Ally intended to make the October 5 call to the Debtor's brother, even after it had already been told that the individual was the brother of a customer in bankruptcy, thereby satisfying the second prong of 11 U.S.C. § 362(k). After becoming aware through the September 7 call that the individual they were calling through the skip trace account was not the brother of the other "Patricia Best," but was the brother of the Debtor, the burden was on Ally to undertake measures to ensure that no further calls to the Debtor or her family members would be made in violation of the automatic stay. Such precautions were evidently not taken. Instead, Ally again called the Debtor's brother on October 5, an act which it intended to do. Accordingly, the October 5 call constitutes a willful violation of the automatic stay.

### B. Damages

Having determined that Ally willfully violated the automatic stay, we must now consider whether the Debtor is entitled to damages. As noted previously, 11 U.S.C. § 362(k) provides for actual damages, as well as punitive damages under appropriate circumstances, when the Debtor is injured by a willful violation of the stay. 11 U.S.C. § 362(k). As the party seeking damages, the Debtor bears the burden of proof on that issue. *Roche*, 361 B.R. at 624.

Actual damages are defined as "real, substantial and just damages, or the amount awarded to a complainant in compensation for [her] actual and real loss or injury, as opposed to nominal damages and punitive damages." *Id.* (citing *McMillian v. FDIC*, 81 F.3d 1041, 1054 (11th Cir. 1996)(quoting BLACK'S LAW DICTIONARY (6th Ed. 1991))) (internal quotations omitted). "Actual damages must be prove[n] with reasonable certainty, and mere speculation, guess or conjecture will not suffice." *In re Castillo*, 456 B.R. 719, 725 (Bankr. N.D. Ga. 2011) (quoting

8

*Aiello v. Providian Fin. Corp.*, 257 B.R. 245, 249 (N.D. Ill. 2000), *aff'd*, 239 F.3d 876 (7th Cir. 2001)) (internal quotations omitted).   Where actual damages are *de minimis*, the court may limit damages to attorney's fees.   *In re Erbesfield*, 2016 WL 7388516, at *2 (Bankr. N.D. Ga. Sept. 22, 2016).

As to actual damages, the Debtor did not identify any out of pocket costs associated with either of the calls made during this case, or any other financial burdens she was forced to incur by virtue of either call.   In fact, as to the October 5 call, the Debtor was not even aware it had occurred until she reviewed Ally's records at the Hearing.   The Debtor did claim that she had incurred some emotional damages as a result of Ally's conduct.   Although emotional distress damages can, in certain limited circumstances, be recovered as actual damages,[7] the issues mentioned by the Debtor at the Hearing do not justify recovery.[8]

The Debtor mentioned stress and concern during the First Case because she was worried that Ally was going to take her car notwithstanding the stay.   She testified that she put the Car in storage for two (2) months to avoid recovery by Ally.   However, all of that occurred prior to this case, and related recovery is barred by the Prior Case Order.   The Debtor also mentioned a deterioration in her relationship with her brother caused by the two (2) calls made by Ally on September 7 and October 5, but the evidence at the Hearing, from the Debtor and in the brother's own recorded words, was that they were already estranged before these calls were made, making

---

[7] Emotional distress can be encapsulated by actual damages under 11 U.S.C. § 362(k).   *See In re Wassem*, 456 B.R. 566, 572 (Bankr. M.D. Fla. 2009)( "Emotional distress constitutes actual damages."); *In re Caffey*, 384 B.R. 297, 309 (Bankr. S.D. Ala. 2008)("Under the Bankruptcy Code's provision for authorizing recovery for a willful violation of the stay, emotional damages qualify as actual damages.")(internal quotations omitted).

[8] To recover damages for emotional distress, the Debtor must "(1) suffer significant emotional distress, (2) clearly establish the significant emotional distress, and (3) demonstrate a causal connection between that significant emotional distress and the violation of the automatic stay." *Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1271 (11th Cir. 2014).

it appear doubtful that the two (2) calls caused a meaningful additional strain or rift in the relationship.  Thus, it does not appear that the Debtor has suffered the kind of significant emotional harm required for a finding of emotional distress damages.  *See In re Caffey*, 384 B.R. 297, 309 (Bankr. S.D. Ala. 2008)(explaining that the debtor must first show that [s]he suffered a significant emotional harm and establish such harm by the evidence.).  As the Debtor has not established facts sufficient to give rise to emotional distress, the Court need not address the existence of a causal link between the stay violation and any alleged distress.

The Debtor failed to demonstrate by the evidence presented at the Hearing any actual damages she suffered as a result of the September 7 and October 5 calls.  The Debtor has also failed to show the existence of emotional distress that would justify an award of actual damages.  Because the Debtor did not adequately prove her damages, and because the Debtor has not occurred any attorney's fees in this case, there is no basis for the Court to award the Debtor actual damages for the September 7 and October 5 calls.

In addition to actual damages, Section 362(k) permits an award of punitive damages under "appropriate circumstances."   11 U.S.C. § 362(k).   Such appropriate circumstances arise where the creditor as acted with maliciousness or in bad faith.   *Castillo*, 456 B.R. at 725.   For an award of punitive damages, courts consider the following factors: "(1) the nature of the defendant's conduct; (2) the nature and extent of the harm to the plaintiff; (3) the defendant's ability to pay; (4) the motives of the defendant; and (5) any provocation by the debtor."   *Roche*, 361 B.R. at 624 (citing cases).

The record in this case does not suggest that an award of punitive damages is appropriate. The nature of Ally's conduct for the September 7 and October 5 calls was not sufficiently egregious

to rise to the level of conduct to justify punitive damages. Although it appears that Ally should have known by the time of the October 5 call that the individual they were calling was the Debtor's brother, and not the brother of the other "Patricia Best," such conduct does not appear to have occurred with malice or in bad faith. Instead, it appears to have been a negligent error.

Hence, the Debtor has failed to show that Ally acted in an egregious, malicious, or vindictive manner in making the two (2) calls to the Debtor's brother. Although the Court finds that the October 5 call does constitute a stay violation, there exists no basis for awarding punitive damages based upon Ally's conduct in this case.

## II. **Confirmation**

As to confirmation, Ally's objections are that the Debtor undervalued the car in the Plan, and that the five percent (5%) interest rate proposed by the Debtor on Ally's secured claim is too low.

### A. **The Value of the Car**

For the Plan to be confirmed, the Court must find that the Plan satisfies the requirements of 11 U.S.C. § 1325(a). Specifically, as to the Plan's treatment of a secured creditor, such as Ally, Section 1325(a)(5) requires that either: (i) Ally accepts the Plan; (ii) the Debtor invokes "cramdown"; or (iii) the Debtor surrenders the subject property. 11 U.S.C. § 1325(a)(5)(A)-(C). Ally has not accepted the Plan, and the Debtor is not surrendering the Car; instead, the Debtor is utilizing the cramdown provision of Section 1325(a)(5)(B) to treat Ally's secured claim in the Plan.

Cramdown under Section 1325(a)(5)(B) permits "a debtor to keep collateral and pay the present value of the allowed secured claim over the life of the plan." *In re McElroy*, 339 B.R.

185, 187 (Bankr. C.D. Ill. 2006). As explained by the Supreme Court in *Assocs. Commercial Corp. v. Rash*:

> Under the cram down option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, see § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral, see § 1325(a)(5)(B)(ii). The value of the allowed secured claim is governed by § 506(a) of the Code.

520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). In deciding which valuation standard to apply in the context of 11 U.S.C. § 1325(a)(5)(B), the Supreme Court held in *Rash* that the replacement value, rather than foreclosure value, applies. *Id.* at 965, 117 S.Ct. at 1886 (interpreting the "disposition or use" statutory language of Section 506(a) as mandating the replacement value standard where a debtor retains the subject collateral).[9]

After *Rash*, 11 U.S.C. § 506(a)(2) was added to the Bankruptcy Code. Section 506(a)(2) expressly provides for a replacement value standard in Chapter 7 and Chapter 13 cases:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)(2). Since *Rash* and the enactment of Section 506(a)(2), courts have utilized various approaches in the valuation of vehicles. The Court in *In re Miles* identified such approaches to include: (i) the average adjusted retail values from the various valuation companies (*e.g.*, the NADA Guide and Kelley Blue Book); (ii) the average of retail and trade-in values;

---

[9] In *Rash*, replacement value is defined as "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." *Rash*, 520 U.S. at 959, n.2, 117 S.Ct. at 1883.

12

(iii) private sale values; and (iv) reduction of retail price by a flat percentage to reflect difference between a dealer's "asking price" and what it would "charge" for the vehicle. *In re Miles*, 524 B.R. 915, 920 (Bankr. N.D. Ga. 2015)(citing cases). However, the "most common approach. . . is to start with the retail value, since that is consistent with Section 506(a)'s direction that the replacement value be the price a retail merchant would charge. Then the court reduces the retail value in varying amounts representing the condition of the vehicle and cost of repair." *Id*. (internal quotations omitted).

Similarly, the retail value provided by guides such as the NADA or Kelley Blue Book is used by courts as a starting point for valuation, with adjustments made based upon the condition of the vehicle or other evidence presented by the parties. *See In Re Morales*, 387 B.R. 36, 45 (Bankr. C.D. Ca. 2008)(" [A]bsent unusual circumstances, the retail value should be calculated by adjusting the Kelley Blue Book or N.A.D.A. Guide retail value for a like vehicle by a reasonable amount in light of any additional evidence presented regarding the condition of the vehicle and any other relevant factors.").[10]

Here, Ally presented uncontroverted evidence that the NADA retail value of the Car is $24,850.00.[11] Such valuations do not take into account accidents in which the Car may have been involved, which reduce the value of the Car. The Debtor presented uncontroverted evidence

---

[10] *See also In re Henry*, 457 B.R. 402, 408 (Bankr. E.D. Pa. 2011)(noting that courts tasked with valuing vehicles in the bankruptcy context frequently use common retail guides such as the NADA or Kelley Blue Book as a starting point).

[11] Prior to the Hearing, Ally tendered to the Court as a potential exhibit for use at the Hearing an appraisal of the Vehicle with a higher valuation. The Debtor objected to elements of the valuation both before (*see* Docket No. 33) and at the Hearing, and objected to its introduction as evidence at the Hearing. Apparently based on those objections (and possibly because the appraiser did not attend the Hearing), Ally never offered that appraisal as evidence, and instead introduced only the referenced NADA value.

13

that the Car has been in at least two (2) accidents – one more significant accident prior to its acquisition by the Debtor, and one minor accident after it was acquired by the Debtor. The Court finds that these accidents reduce the value of the Car by ten percent (10%), or $2,485.00, to $22,365.00.[12]

Ally also introduced evidence through the Debtor about certain modifications that the Debtor has made to the Car since she acquired it. The Debtor testified that she put on most of the additional parts herself, and that doing so for most of them simply required attaching them to the Car with a few screws. However, no credible evidence was introduced that established the value of the additions, so the Court ascribes no value to them.[13]

In light of the foregoing, the value ascribed to the Car in the Plan, $22,375.00, satisfies 11 U.S.C. §§ 1325(a)(5) and 506(a)(2).

### B.  Interest Rate

As noted previously, the Plan provides for the cramdown of Ally's secured claim pursuant to 11 U.S.C. § 1325(a)(5)(B). In the context of cramdown, the secured creditor is entitled to a stream of payments over the life of a plan equal to the present value of its claim. However, the amount of each payment "must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." *Till v. SCS Credit Corp.*, 541 U.S. 465, 469, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). In *Till*, the Supreme

---

[12] The Debtor during the Hearing made a number of statements regarding what she thought the Car might be worth. The Debtor is not, however, an expert on the valuation of automobiles, so the Court determined to begin its analysis with the NADA retail value presented by Ally, and not by any testimony of the Debtor on that issue.

[13] At certain points in the Hearing, it appeared that the Debtor might be saying that the additions increased the value of the Car by $1,000.00; however, it was ultimately not clear whether the Debtor meant the Car was worth $1,000.00 more, or that the additions had cost her $1,000.00. It is also not clear that the parts, which could also be removed by the loosening of a few screws, are sufficiently part of the vehicle to constitute accessions that would be included in Ally's collateral. *See* O.C.G.A. §§ 11-9-102(a)(1), 11-9-335.

Court adopted the "prime-plus" approach for determining the interest rate to be paid to a creditor subject to cramdown. *Till*, 541 U.S. at 478-80 124 S.Ct. at 1961-62. The Supreme Court in *Till* explained that:

> The approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly.

*Id*. Although it did not expressly adopt a specific range to represent the risk factor to be added to the prime rate, the Supreme Court did suggest that a range of one to three percent (1-3%) for add-ons might be appropriate based upon a survey of cases cited in a prior Second Circuit opinion. *Till*, 541 U.S. at 480, 124 S.Ct. at 1962. On the facts of *Till*, the Supreme Court affirmed the bankruptcy court's determination to add one and one-half percent (1.5%) to an eight percent (8%) prime rate. *Till*, 541 U.S. at 471, 124 S.Ct. at 1956-57. Factors considered in *Till* for computing a proper add-on to the prime rate include: the delay in payment to the secured creditor, intervening inflation over the life of the plan, and the potential risk of nonpayment. *Till*, 541 U.S. at 474, 124 S.Ct. at 1958.

In this case, Ally noted for the record, unopposed, that the prime rate on the Filing Date was 4.75 percent (4.75%). Under *Till*, the Supreme Court suggested that the secured creditor bears the burden to justify the add-on percentage to the prime rate. *Till*, 541 U.S. at 479, 484-85, 124 S.Ct. 1961, 1964-65. Ally presented no evidence as to its view of an appropriate interest rate, or an appropriate add-on to the prime rate. It did elicit from the Debtor evidence that suggests that the Debtor's payment history with Ally has been inconsistent, that a number of

15

payments were made 0 to 30 days late, and that a few payments were made 60 and 90 days late. Ally also indicated that the Debtor had taken advantage of a program offered by Ally to add missed payments to the end of the loan on one or two occasions in the three years that the Ally loan secured by the Car has been in existence.

In this case, the delay in payment to the creditor will be five (5) years – not an unusual period in car finance, and in fact a little on the short end in an economic environment where the Court sees many 72 and even 78 month loans. Inflation at present is low, and is not expected to increase materially in the next 60 months. The Debtor's prior payment history does suggest some risk of nonpayment. Based on the foregoing, an add-on risk factor of 1.75 percent (1.75%) appears appropriate to the Court, resulting in a required interest rate under the Plan of 6.5 percent (6.5%).

Having heard the argument and having considered the evidence presented at the Hearing, upon review of the Sanctions Motion, the Plan, and the record in this case and the Prior Case, for the reasons set forth above, it is

**ORDERED** that the Sanctions Motion be, and the same hereby is, **DENIED**; and it is further

**ORDERED** that confirmation of the Plan is **DENIED**, because the interest rate proposed is inadequate and because at an adequate interest rate the Plan will not pay out in 60 months as required by 11 U.S.C. §§ 1322(d) and 1325(b)(4); and it is further

**ORDERED** that the foregoing denial of confirmation is without prejudice to the submission by the Debtor of an amended Chapter 13 plan within thirty (30) days of the entry of this Order that raises the interest rate on the Ally claim to 6.5 percent and increases the monthly

payment under the Plan[14] to an amount adequate to pay out the case in 60 months;[15] and it is further

**ORDERED** that if the Debtor files an amended Plan that complies with the foregoing requirements,[16] the Court will consider entry of an order confirming the amended Plan without further notice or a hearing.[17]

The Clerk is directed to serve a copy of this Order upon the Debtor, counsel for Ally, and the Chapter 13 Trustee.

**[END OF DOCUMENT]**

---

[14] To increase her monthly payment under the Plan, the Debtor will, in addition to filing and serving an amended Plan, need: (i) to file amended Schedules I and J to show her ability to make such increased payments, and (ii) to provide to the Trustee such other evidence as is necessary to substantiate her ability to make those payments.

[15] According the rough calculations of the Court, the payment would need to be at least $575.00 per month.

[16] Compliance of the amended Plan with the foregoing requirements might be evidenced by a supplemental report filed by the Trustee recommending confirmation of the amended Plan.

[17] No hearing would be required, as this Order addresses all of the objections asserted to confirmation of the current Plan, and the limited amendments required herein would not raise other issues, with the possible exception of feasibility. As to that, no party raised feasibility as an issue at the Hearing, and it does not seem likely that the *de minimis* increase in Plan payment here would legitimately raise that issue.